UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

             Plaintiff,

vs.                        REPORT AND
                        RECOMMENDATION

Elias Ambriz Becerra,

             Defendant.        Crim. No. 07-378 (MJD/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I.  Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the Motion of the Defendant Elias Ambriz Becerra to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 24].  A Hearing on the Motion was conducted on December 17, 2007, at which time, the Defendant appeared personally, and by Douglas Olson, Assistant Federal Defender, and the Government appeared by Andrew S. Dunne, Assistant United States

Attorney.[1]  For reasons which follow, we recommend that the Defendant's Motion be denied.

## II.  Factual Background

The Defendant is charged with two (2) Counts of Distributing Methamphetamine, in the amount of approximately twenty-eight (28) grams, in violation of Title 21 U.S.C. §§841(a)(1), and 841(b)(1)(C).  He is also charged with one (1) Count of Distributing Methamphetamine, in the amount of approximately 240 grams, in violation of Title 21 U.S.C. §§841(a)(1), and 841(b)(1)(B).  The events which give rise to those charges are alleged to have taken place on or about December 7, December 14, and December 20, 2006, in this State and District.  As pertinent to

---

[1]At the close of the Hearing, the parties requested leave to submit post-Hearing memoranda on the legal issues raised by the Defendants' Motion.  Leave was granted, however, by letter dated December 28, 2007, the Defendant's counsel advised that he no longer intended to submit any post-Hearing memorandum.  Accordingly, at that time, the Motion was taken under advisement.  See, Title 18 U.S.C. §3161(h) (1)(F) and (J); Henderson v. United States, 476 U.S. 321, 330-32 (1986); United States v. Blankenship, 67 F.3d 673, 676-77 (8th Cir. 1995).  Given the absence of briefing, our analysis is unaided by any pre- or post-Hearing briefing by the Defendant, and by no specific recitation, during the course of the Hearing, as to any of the purported deficiencies in the arrest, and Warrant, at issue.  Nevertheless, our obligation is to independently assess the legitimacy of the arrest, and the Warrant, to undertake our own independent research, and the Recommendation we make reflects the results of that analysis.

those charges, and to the Motion now before us, the operative facts may be briefly summarized.[2]

At the Hearing, Jason S. Okerstrom ("Okerstrom"), who is an investigator with the Stearns County Sheriff's Office, and who is assigned to the Central Minnesota Drug and Gang Task Force (the "Task Force"), testified at the instance of the Government. In his testimony, Okerstrom detailed his investigation of the Defendant, which involved three (3) controlled purchases of methamphetamine, on December 7, December 14, and December 20, 2006. Okerstrom testified that the same Confidential Informant ("CI") set up, and participated in, each controlled purchase. Okerstrom testified that the CI had never before worked with law enforcement, and he further

---

[2]Rule 12(d), Federal Rules of Criminal Procedure, provides that "[w]hen factual issues are involved in deciding a motion, the court must state its essential findings on the record." See, United States v. Santiago, 410 F.3d 193, 198 (5th Cir. 2005), cert. denied, 126 S.Ct. 1565 (2006). As augmented by our recitation of factual findings in our "Discussion," the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion. Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent development of the facts and law may require. See, United States v. Moore, 936 F.2d 287, 288-89 (6th Cir. 1991); United States v. Prieto-Villa, 910 F.2d 601, 610 (9th Cir. 1990).

- 3 -

testified that the CI faced pending criminal charges when he began cooperating with Okerstrom.

Okerstrom testified that the CI set up each purchase with the Defendant. Before meeting the Defendant, the CI would meet first with Okerstrom. Okerstrom would search the CI and his or her vehicle for any contraband. Okerstrom would then provide the CI with an electronic monitoring device, which allowed Okerstrom to conduct audio surveillance of the CI during the controlled purchase. Okerstrom also provided the CI with pre-recorded buy funds for each transaction. After each transaction, Okerstrom would meet with the CI to recover the purchased methamphetamine.

On December 7, 2006, after setting up a controlled purchase with the Defendant, the CI met with Okerstrom, in accordance with their usual routine. After providing the CI with pre-recorded buy funds, and an electronic monitoring device, the CI and Okerstrom traveled to a grocery store in Melrose. Once there, the CI got into the Defendant's vehicle, while law enforcement observed from a distance. The CI purchased one (1) ounce of methamphetamine during that transaction, which he later turned over to Okerstrom. Okerstrom was able to visually observe parts of the transaction. He testified that he also made an audio recording of the transaction,

although the CI and the Defendant spoke in Spanish.  Okerstrom testified that he does

not speak Spanish, and that he did not have an interpreter along during his surveillance.

On December 14, 2006, after setting up another controlled purchase with the

Defendant, the CI met with Okerstrom, consistent with their usual routine.  After

providing the CI with pre-recorded buy funds, and an electronic recording device, the

CI and Okerstrom traveled to an auto parts store in Melrose.  Okerstrom observed the

Defendant in his vehicle, alone, in the parking lot of the store.  The CI was alone in his

car.  Okerstrom could not recall whether the Defendant got into the CI's car, or

whether the CI got into the Defendant's car, but he testified that the CI and the

Defendant were alone in one of their vehicles during the transaction.  Okerstrom and

others officers performed visual surveillance, and Okerstrom made an audio recording

of the conversation between the CI and the Defendant, which was again in Spanish.

After the transaction, the CI met with Okerstrom, and turned over one (1) ounce of

methamphetamine, for which he had provided the Defendant with $1,200.00 in pre-

recorded buy funds.  The CI advised Okerstrom that the Defendant returned $100.00

of the pre-recorded buy funds at the time of the transaction, which the CI then turned

over to Okerstrom.

On December 20, 2006, after setting up another controlled purchase with the Defendant, the CI met with Okerstrom, per their usual routine. The CI and Okerstrom then traveled to the same auto parts store, in Melrose. Okerstrom testified that the Defendant walked to the auto parts store, and got into the CI's vehicle when the CI arrived. Okerstrom and other officers performed visual surveillance, and Okerstrom again made an audio recording of the CI's conversation with the Defendant, which was in Spanish. After the transaction, the Defendant left on foot. The CI met with Okerstrom, and provided eight (8) ounces of methamphetamine, which the CI had purchased from the Defendant with $8,000.00 in pre-recorded buy funds. The CI informed Okerstrom that the Defendant had returned $500.00 of the pre-recorded buy funds at the time of the transaction, which the CI then turned over to Okerstrom. Okerstrom then signaled his fellow officers to execute an arrest of the Defendant, based on the narcotics transaction. In his testimony, Okerstrom acknowledged that he did not have an Arrest Warrant for the Defendant.

Okerstrom testified that the Defendant was searched, incident to his arrest. No drugs were recovered, but the officers found $7,500.00 in pre-recorded buy funds, from the Defendant's controlled purchase that day. Okerstrom testified that the Defendant was arrested less than ten (10) minutes after his final transaction with the CI,

at approximately 2:45 o'clock p.m.  After the Defendant's arrest, Okerstrom applied for a Search Warrant, for the Defendant's residence.

At the Hearing, the Government proffered, as an Exhibit, a Search Warrant and supporting Affidavit, which is dated December 20, 2006, along with an Inventory Return, dated December 21, 2006, which was filed in Stearns County District Court. See, Exhibit 1.  The Search Warrant authorized a search of a two-story single family dwelling and detached garage, located on Riverside Avenue in the City of Melrose, Minnesota (the "House"), as well as a green 1993 Mercury Sable station wagon, bearing Minnesota license plate KDM-129 (the "Station Wagon"), and a white 1997 Ford F-150 pickup truck, bearing Minnesota license plate HLU-814 (the "Pickup Truck").  See, Exhibit 1, Warrant.

The Search Warrant authorized a search for controlled substances; United States currency; items associated with the distribution of controlled substances, including scales, packaging materials, and cutting materials; equipment that may be used to facilitate drug transactions, including cellular telephones, pagers, scanners, and surveillance equipment; drug notes, ledgers, and other documents tending to indicate the sale of controlled substances, or co-conspirators; electronically stored information; documents indicating residency; documents and keys relating to separate storage

facilities; photographs and videos that may depict co-conspirators or controlled substances; firearms or other weapons; and precious stones and metals found in proximity to controlled substances.  Id.

In support of the Search Warrant, Okerstrom submitted an Application and Affidavit which set forth the reasons that caused him to believe that evidence of criminal activity would be found at the Defendant's House, and in the above-mentioned vehicles.  See, Exhibit 1, Application.  Okerstrom averred that he and other members of the Task Force had worked with the CI to perform the previously-detailed controlled purchases.  Okerstrom further averred that the CI's identity was known to him, and that the CI was currently facing a pending drug charge.  Okerstrom stated that the CI wished to remain anonymous, because he or she feared retaliation for his or her participation in the investigation.  The CI told Okerstrom that he knew the Defendant as "Jonesy," although he also knew that was not his real name.  The CI informed Okerstrom that he knew the Defendant through work, and he knew that the Defendant lived in a house on Riverside Avenue in Melrose.  The CI further informed Okerstrom that he had purchased methamphetamine on four (4) prior occasions from the Defendant.

Okerstrom averred that, just prior to the transaction on December 7, 2006, he observed a man leaving the House, and walking into a detached garage.  The garage door was open, and Okerstrom could also see the Pickup Truck, although he was unable to identify the man at that time.  The garage door closed briefly, and when it re-opened, the Pickup Truck left the House and traveled to the grocery store parking lot. There, the CI got into the Pickup Truck for a brief time.  The CI then left the grocery store parking lot, and traveled to a pre-determined location, where he again met the Defendant.  At that point, the CI provided the Defendant with buy funds, and received what Okerstrom described as a wholesale amount of methamphetamine, which later field-tested positive for the presence of methamphetamine.  At that point in the investigation, another investigator on the Task Force confirmed that the Pickup Truck was registered to the Defendant, at the address of the House.

On December 13, 2006, Okerstrom met with the CI, and showed him two (2) photographs from the State Department of Motor Vehicles.  The CI positively identified both photographs as "Jonesy."  Okerstrom averred that one of the photographs was under the name of Raul Jones Jr., while the other was under the name of the Defendant.

On December 14, 2006, Okerstrom followed the CI to the auto parts store, to meet the Defendant for the controlled purchase.  The CI parked next to the Station Wagon, which investigators confirmed was registered to a Luis Andrade Rivas of Austin, Minnesota.  The CI got into the Station Wagon.  From his position, Okerstrom was able to positively identify the Defendant as the driver of the Station Wagon.  After the CI left the vehicle, another investigator on the Task Force followed the Defendant back to the House.  Okerstrom met the CI at a predetermined location, and the CI provided a wholesale amount of a substance which field-tested positive for the presence of methamphetamine.

On December 20, 2006, investigators again performed surveillance while the CI met with the Defendant in the parking lot of the auto parts store.  During the meeting, investigators overheard the CI tell the Defendant that the deal was good.  When the Defendant left the scene, he was arrested.  Okerstrom met the CI, who turned over a substance which field-tested positive for the presence of methamphetamine.

At the Hearing, Okerstrom testified that he was present when the Search Warrant was executed at the Defendant's residence.  Okerstrom advised that two (2) children answered the door at the House, and he and his fellow officers identified themselves as law enforcement.  Okerstrom testified that once he was inside the

House, he provided a copy of the Search Warrant to the adults at the residence. According to Okerstrom, the officers recovered $1,500.00 in United States currency from the House, including $500.00 of pre-recorded buy funds from the transaction on December 14, 2006.   They also recovered a 45-caliber handgun, and documents indicating the Defendant's residency at the House, and his ownership of the Pickup Truck.  The search did not reveal any controlled substances, scales, or other evidence of narcotics trafficking.

## III.  Discussion

In his Motion, the Defendant asserts that his arrest, and the subsequent search of his person, on December 20, 2006, was without probable cause, and he further asserts that the Search Warrant, which was issued for his House on that same date, was similarly lacking in probable cause.  We first address the constitutionality of the Defendant's arrest, before turning our attention to a review of the Search Warrant, in order to determine whether it was supported by probable cause, or contained other fatal defects.

A.      The Constitutionality of the Defendant's Arrest.

1.      Standard of Review.  When a police officer has probable cause to believe that a person has committed a felony, a warrantless arrest is permitted.  United States v. Travis, 993 F.2d 1316, 1323 (8th Cir. 1993), citing United States v. Watson, 423 U.S. 411 (1976).  "Determining probable cause to arrest requires the court to focus on the moment the arrest was made and to ask whether 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'"  United States v. Taylor, 106 F.3d 801, 803 (8th Cir. 1997), quoting Beck v. Ohio, 379 U.S. 89, 91 (1964); see also, Kiser v. Huron, 219 F.3d 814, 816 (8th Cir. 2000)("Furthermore, '[a]n officer has probable cause to make a warrantless arrest when facts known to the officer are sufficient to make a reasonably prudent officer believe that the suspect is committing or has committed an offense.'"), quoting Olinger v. Larson, 134 F.3d 1362, 1366 (8th Cir. 1998); Tokar v. Bowersox, 198 F.3d 1039, 1046-47 (8th Cir. 1999)("The existence of probable cause in fact to make a warrantless arrest depends upon whether, at the moment the arrest was made, the facts and circumstances within the arresting officers' knowledge, and of which they had reasonably trustworthy information, were sufficient

- 12 -

to warrant a prudent person to believe that the suspect had committed or was committing an offense.").

"'The determination of whether probable cause exists must not rest on isolated facts; rather it depends on the cumulative effect of the facts in the totality of circumstances.'"   Tokar v. Bowersox, supra at 1047, quoting United States v. Everroad, 704 F.2d 403, 406 (8th Cir. 1983).   We keep in mind, however, that "[p]robable cause does not require a prima facie showing of criminal activity, but only the probability of criminal activity."   Id.

A search incident to a valid arrest is constitutional.   See, e.g., New York v. Belton, 453 U.S. 454, 461 (1981); Chimel v. California, 395 U.S. 752, 762 (1969); United States v. Klein, 13 F.3d 1182, 1184 (8th Cir. 1994), cert. denied, 512 U.S. 1226 (1994).   "A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification."   Id., quoting United States v. Robinson, 414 U.S. 218, 235 (1973); see also, Curd v. City Court of Judsonia, Ark., 141 F.3d 839, 842 (8th Cir. 1998)("Warrantless searches incident to a custodial arrest are 'justified by the reasonableness of searching for weapons, instruments of escape,

- 13 -

and evidence of crime when a person is taken into official custody and lawfully detained.'"), quoting United States v. Edwards, 415 U.S. 800, 802-03 (1974).

        2.    Legal Analysis.   On this Record, we find no basis for the Defendant's contention, that his arrest on December 20, 2006, was unlawful, and accordingly, the evidence which was uncovered, during a search of his person incident to that arrest, is admissible.   As an initial matter, we recognize that the information, which led to the Defendant's arrest, derived from the CI's controlled transactions with the Defendant.  When probable cause for an arrest is based on information provided by an informant, "'a key issue is whether that information is reliable.'"  United States v. Koons, 300 F.3d 985, 993 (8th Cir. 2002), quoting United States v. Fulgham, 143 F.3d 399, 401 (8th Cir. 1998); see also, United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986)("[T]he informant's reliability, veracity, and basis of knowledge are relevant considerations -- but not independent, essential elements -- in finding probable cause.").  As our Court of Appeals has explained:

> In [Illinois v.] Gates, the Supreme Court explained that an informant's reliability and basis of knowledge "are better understood as relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable-cause determinations: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other

indicia of reliability." * * * 462 U.S. at 233, 103 S.Ct. at 2329.

United States v. Olson, 21 F.3d 847, 850 (8th Cir. 1995).

As a result, "'an informant's basis of knowledge [is] an important consideration, but not a rigid requirement, in the probable cause determination.'" Id., citing United States v. Anderson, 933 F.2d 612, 615 (8th Cir. 1991).

Consequently, the "core question" is whether the information provided by the informant was reliable. See, United States v. Williams, 10 F.3d 590, 593 (8th Cir. 1993)("The core question in assessing probable cause based upon information supplied by an informant is whether the information is reliable."). Moreover, "[t]he statements of a reliable confidential informant are themselves sufficient to support probable cause." United States v. Wright, 145 F.3d 972, 975 (8th Cir. 1998), cert. denied, 525 U.S. 919 (1998). In turn, an informant is deemed reliable when his/her statements are corroborated by independent evidence. See, United States v. Carpenter, 341 F.3d 666, 669 (8th Cir. 2003) ("[C]orroboration of minor, innocent details may support finding of probable cause."), citing United States v. Tyler, 238 F.3d 1036, 1039 (8th Cir. 2001); see also United States v. Koons, supra at 993 ("'Information may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of supplying reliable information,

or if it is corroborated by independent evidence.'"), quoting United States v. Fulgham,

supra at 401; United States v. Formaro, 152 F.3d 768, 770 (8th Cir.

1998)("[C]orroboration of the confidential informant's information by independent

investigation is an important factor in the calculus of probable cause.").

Here, we conclude that the officers reasonably relied on the information

provided by the CI, even though he or she had not previously cooperated with law

enforcement as an informant, because the CI was known to Okerstrom. See, United

States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005), quoting Florida v. J.L., 529 U.S.

266, 270 (2000)("[A] known informant * * * can be held responsible if her allegations

turn out to be fabricated.").  Moreover, Okerstrom testified that he and other officers

performed partial visual surveillance of each transaction, as well as audio surveillance

of the CI and the Defendant.  He also testified that he and the CI made contact,

following each controlled purchase, at which time, the CI would turn over the

methamphetamine he or she had procured from the Defendant.  See, United States v.

Rivera, 410 F.3d 998, 1002 (8th Cir. 2005)(informant's credibility was established

where his representations were corroborated by officer surveillance, and the recovery

of narcotics from the informant following a controlled drug transaction); United States

v. Smith, 266 F.3d 902, 905 (8th Cir. 2001)(finding that an Affidavit which detailed an

officer's surveillance of controlled drug transactions provided probable cause to support a Search Warrant); United States v. Taylor, supra at 803 (Information from a previously unknown informant must be independently verified to establish reliability, but this verification can come from innocent details).

Accordingly, we conclude that the Task Force investigators had ample reason to believe that the Defendant was actively engaged in drug trafficking, at the time of his arrest on December 20, 2006.   Accordingly, we find no reason to suppress the evidence that was found on the Defendant's person, in a search incident to that arrest.

B.   The Constitutionality of the Search Warrant.

The Defendant next asks that we review the Search Warrant for the House, in order to determine whether it was supported by probable cause, or contained other fatal defects.

1.   Standard of Review.   In the issuance of a Search Warrant, the Fourth Amendment dictates that an impartial, neutral, and detached Judicial Officer, will assess the underlying factual circumstances so as to ascertain whether probable cause exists to conduct a search, or to seize incriminating evidence, the instrumentalities or fruits of a crime, or contraband.   See, Warden v. Hayden, 387 U.S. 294 (1967); United States v. Johnson, 64 F.3d 1120, 1126 (8th Cir. 1995), cert. denied,

516 U.S. 1139 (1996).  In order to find probable cause, it must be demonstrated that, in light of all the circumstances set forth in the supporting Affidavit, there is a fair probability that contraband, or evidence of a crime, will be found in a particular, designated place.  See, United States v. Gladney, 48 F.3d 309, 313 (8th Cir. 1995); United States v. Tagbering, 985 F.2d 946, 949 (8th Cir. 1993).  For these purposes, probable cause is "a fluid concept, turning on the assessment of probabilities in particular factual contexts, not readily, or even usefully, reduced to a neat set of legal rules."  Illinois v. Gates, 462 U.S. 213, 232 (1983); see also, Ornelas v. United States, 517 U.S. 690, 695 (1996).

"Search warrant '[a]pplications and affidavits should be read with common sense and not in a grudging hyper technical fashion.'"  United States v. Ryan, 293 F.3d 1059, 1061 (8th Cir. 2002), quoting United States v. Goodman, 165 F.3d 610, 613 (8th Cir. 1999), cert. denied, 527 U.S. 1030 (1999).  In conducting such an examination, the Court should review the Affidavits as a whole, and not on a paragraph-by-paragraph basis.  See, United States v. Anderson, supra at 614; Technical Ordnance, Inc. v. United States, 244 F.3d 641, 649 (8th Cir. 2001), cert. denied, 534 U.S. 1084 (2002).

Moreover, the reviewing Court must not engage in a de novo review but, rather, should accord great deference to the decision of the Judicial Officer who issued the Warrant.  See, United States v. Maxim, 55 F.3d 394, 397 (8th Cir. 1995), cert. denied, 516 U.S. 903 (1995); United States v. Curry, 911 F.2d 72, 75 (8th Cir. 1990), cert. denied, 498 U.S. 1094 (1991).  This mandated deference to the determination of the issuing Judicial Officer is consistent with the Fourth Amendment's sound preference for searches that are conducted pursuant to Warrants.  See, Illinois v. Gates, supra at 236.

2.    Legal Analysis.  Our review of the Search Warrant for the House, and its underlying application, confirms the appraisal of the issuing Judicial Officer, that ample probable cause supported the issuance of the Warrant, and further, that the Warrant was not otherwise fatally defective.

We recognize that, as previously detailed, much of the information, which is contained in the Affidavit, was supplied by the CI who worked with Okerstrom.  For the reasons previously expressed, we conclude that Okerstrom reasonably relied upon the information provided by the CI, in applying for the Search Warrant.

As such, we concur with the implicit determination of the issuing Judicial Officer, that probable cause was present to believe that the Defendant was making use

of the House to engage in ongoing narcotics trafficking, over a period spanning approximately thirty (30) days, as well as on the same day that the Search Warrant was issued.   Moreover, it is undisputed that law enforcement had established a nexus, between the Defendant and the House, and between the Defendant and the Pickup Truck, given law enforcement's observations of the Defendant at the House, and driving the Pickup Truck, and given the uncontradicted vehicle registration records, which listed the Defendant as the owner of the Pickup Truck, and which listed the House as his address.   In addition, it is undisputed that the Defendant was observed by Okerstrom, and by other officers, driving both the Pickup Truck and the Station Wagon to and from the residence, in order to meet with the CI for the controlled transactions.

Our Court of Appeals has repeatedly recognized that "information in the affidavit showing that [the defendant] engaged in a continuing course of drug trafficking * * * along with [the Affiant's] averment based upon his experience that drug traffickers often keep in their residences records of their elicit activity, large amounts of cash, assets purchased with the proceeds of drug transactions, and guns to protect their guns and cash, provided the issuing judge with a substantial basis for finding probable cause to search [the defendant's] residence." United States v. Luloff,

15 F.3d 763, 768 (8ᵗʰ Cir. 1994); see, United States v. Walker, 324 F.3d 1032, 1038 (8ᵗʰ Cir. 2003); United States v. Premises Known as 6040 Wentworth Ave. South Mpls., 1996 WL 260745 at * 4 (D. Minn. 1996), aff'd, 123 F.3d 685 (8ᵗʰ Cir. 1997); see also, United States v. Thomas, 989 F.2d 1252, 1254 (D.C. Cir. 1993). Although Okerstrom does not specifically aver, in his Affidavit, that he knows that drug traffickers keep such evidence in their homes and vehicles, he does attest to his experience and training in narcotics investigations. See, Exhibit 1, Application at 1-3. Considering the totality of the circumstances, we find that Okerstrom's Affidavit provided probable cause to believe that evidence of criminal activity would be uncovered at the House, in the Pickup Truck, and in the Station Wagon.

We also find that the information provided by the CI was not impermissibly stale, at the time that the Search Warrant was issued. "It is axiomatic that probable cause must exist at the time of the search and not merely at sometime earlier." United States v. Kennedy, 427 F.3d 1136, 1141 (8ᵗʰ Cir. 2005), citing United States v. Formaro, supra at 771; see, United States v. Ozar, 50 F.3d 1440, 1446 (8ᵗʰ Cir. 1995), cert. denied, 516 U.S. 871 (1995). Therefore, a lapse of time, between the observations of a witness and the issuance of a Search Warrant, like a delay in

- 21 -

executing a Search Warrant, "may make probable cause fatally stale." United States v. Maxim, supra at 397 [quotations omitted].

"There is no bright-line test for determining when information is stale," and the passage of time, alone, is "not always the controlling factor," as other factors, such as "the nature of the criminal activity involved and the kind of property subject to the search," are also relevant to the inquiry. Id., quoting United States v. Koelling, 992 F.2d 817, 822 (8th Cir. 1993); United States v. Rugh, 968 F.2d 750, 754 (8th Cir. 1992); see also, United States v. Kennedy, supra at 1141; United States v. Chrobak, 289 F.3d 1043, 1046 (8th Cir. 2002). As but one example, when the Affidavit alleges an "ongoing continuous criminal enterprise, the passage of time between the receipt of information and the search becomes less critical in assessing probable cause." United States v. Rugh, supra at 754.

As a result, in our analysis, we must not "simply count[] the number of days between the occurrence of the facts supplied and the issuance of the affidavit," but must consider any passage of time "in the context of a specific case and the nature of the crime under investigation." United States v. Maxim, supra at 397, quoting United States v. Koelling, supra at 822. Furthermore, "'where recent information corroborates otherwise stale information, probable cause may be found.'" United

States v. Ozar, supra at 1446, quoting United States v. Macklin, 902 F.2d 1320, 1326 (8th Cir. 1990), cert. denied, 498 U.S. 1031 (1991).

As our Court of Appeals has explained, "[i]n investigations of ongoing narcotic operations, 'intervals of weeks or months * * * [do] not necessarily make the information stale.'" United States v. Smith, supra at 905, quoting United States v. Formaro, supra at 771; see also, United States v. LaMorie, 100 F.3d 547, 554 (8th Cir. 1996)("Where continuing criminal activity is suspected, the passage of time is less significant."). "'[W]here recent information corroborates otherwise stale information, probable cause may be found.'" United States v. Ozar, supra at 1446, quoting United States v. Macklin, supra at 1326; see also, United States v. Tyler, supra at 1039 (finding that Affidavit which referenced controlled purchases occurring "within the last seven months" was not unduly stale).

Here, we find that the information contained in the Search Warrant was not fatally stale at the time the Search Warrant was issued, and executed. Although the CI informed Okerstrom that he or she had purchased methamphetamine from the Defendant approximately four (4) times in the past, that information had been "freshened" by the CI's recent controlled purchases from the Defendant, including a controlled purchase on the day of the application for, and issuance of, the Warrant.

- 23 -

See, <u>United States v. Ozar</u>, supra at 1446 ("'[W]here recent information corroborates otherwise stale information, probable cause may be found.'"), quoting <u>United States v. Macklin</u>, supra at 1326; see also, <u>United States v. Morrow</u>, 2004 WL 385278 at *1 (8th Cir., March 2, 2004)("The seven-day delay did not render stale the information on which the Warrant was based."), citing <u>United States v. Gibson</u>, 123 F.3d 1121, 1124-25 (8th Cir. 1997)(four-day delay did not render the Warrant stale where drug activity was ongoing).

Therefore, we find nothing stale about the information, upon which probable cause was predicated, and we reject the Defendant's implicit argument that the Search Warrant, for the House, the Pickup Truck, and the Station Wagon, was defective on probable cause grounds.[3]   Moreover, our review of the Search Warrant, and its supporting papers, fails to disclose any other fatal defect, and the Defendant draws none to our attention.   Accordingly, we recommend that the Defendant's Motion to Suppress be denied.

--------

[3]Even if the information in the Search Warrant had been insufficient to establish probable cause, or was impermissibly stale, we would be compelled, by the law of this Circuit, to find that the officers' reliance upon the Search Warrant was reasonable, because the Warrant was "not so facially lacking in probable cause as to preclude the executing officers' good faith reliance thereon."   <u>United States v. McNeil</u>, 184 F.3d 770, 775 (8th Cir. 1999), citing <u>United States v. Leon</u>, 468 U.S. 897, 922-23 (1984).

NOW, THEREFORE, It is --

RECOMMENDED:

That the Motion of the Defendant Elias Ambriz Becerra to Suppress Evidence

Obtained as a Result of Search and Seizure [Docket No. 24] be DENIED.


Dated:  January 2, 2008                    s/Raymond L. Erickson
                                           Raymond L. Erickson
                                           CHIEF U.S.  MAGISTRATE JUDGE


NOTICE

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn.

LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and

Recommendation by filing with the Clerk of Court, and by serving upon all parties **by**

**no later than January 18, 2008**, a writing which specifically identifies those portions

of the Report to which objections are made and the bases of those objections.  Failure

to comply with this procedure shall operate as a forfeiture of the objecting party's right

to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than January 18, 2008**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.